UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAMES PETTUS,

                                Plaintiff,

     - v -                                                   Civ. No. 9:04-CV-253
                                                              (LEK/RFT)

GLENN S. GOORD, Commissioner of Correctional Services
LESTER WRIGHT, Assistant Commissioner Health Services,
SGT. APPLEBY, C.O. KELSEY, and C.O. MAYER,

                                Defendants.

**APPEARANCES:**                                                   **OF COUNSEL:**

JAMES PETTUS
Plaintiff, *Pro Se*
03-R-3597
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821

HON. ELIOT SPITZER                                        DAVID L. FRUCHTER, ESQ.
Attorney General for the State of New York           Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

*Pro se* Plaintiff James Pettus brings a civil action pursuant to 42 U.S.C. § 1983, alleging Defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment.[1] Dkt. No. 1, Compl. at ¶ CLAIM I. Defendants Glenn Goord, Commissioner of

---

[1] Pettus is no stranger to litigation as he has a long history in the federal court system. *See*, *e.g.*, *Pettus v. Brown et al.*, 9:06-CV-152 (NAM/DRH) (N.D.N.Y.); *Pettus v. Richards et al.*, 9:06-CV-30 (LEK/DRH) (N.D.N.Y.); *Pettus v. Horn*, 2005 WL 2296561 (S.D.N.Y. Sept. 21, 2005) (bringing a cause of action for inadequate medical care with regard to his Vertigo and Tinnitus at Rikers Island); *Pettus v. Selsky*, 131 Fed. App'x 334 (2d Cir. 2005); *Pettus v.*

Correctional Services, Lester Wright, Assistant Commissioner of Health Services, Sergeant Appleby, Correction Officer ("C.O.") Kelsey, and C.O. Mayer bring a Motion for Summary Judgment.  Dkt. No. 91.  Plaintiff opposes the Motion.  Dkt. No. 96.  For the reasons to follow, it is recommended that the Motion for Summary Judgment be **granted**.

## I.  FACTS[2]

On or about October 2, 2003, Plaintiff was referred to an Ear, Nose, and Throat ("ENT") specialist for his complaints of dizziness, which Plaintiff states is Vertigo, and "Tinnitus."  Compl., Exs. 1, Progress Note, dated Oct. 17, 2003, & 2, Consultation Req.  On October 17, 2003, Plaintiff was seen by the ENT specialist while housed at Rikers Island ("Rikers") and a recommendation was made for Plaintiff to receive an MRI of his brain.  *Id.*, Exs. 1, Progress Note, dated Oct. 17, 2003, & 14, Ambulatory Health Record ("AHR") entry, dated Oct. 27, 2003.  Apparently the MRI was scheduled for October 27, 2003, however, Plaintiff was being transferred from the Rikers Island

---

*McGinnis*, 2005 WL 1338818 (S.D.N.Y. June 8, 2005); *Pettus v. Mangano*, 2005 WL 1123761 (E.D.N.Y. May 9, 2005) (noting that "[i]n light of plaintiff's extensive history of filing meritless lawsuits, . . . [the Eastern District of New York] has barred plaintiff pursuant to 28 U.S.C. § 1915(g) from filing any *in forma pauperis* complaints unless he is under imminent danger of serious physical injury"); *Pettus v. Richards*, 2005 WL 928629 (N.D.N.Y. Mar. 28, 2005); *Pettus v. Zimms*, 9:04-CV-802 (GLS/RFT) (N.D.N.Y); *Pettus v. Selsky*, 9:04-CV 627 (FJS/DEP) (N.D.N.Y.); *Pettus v. Bartlett*, 2004 WL 1429908 (W.D.N.Y. June 24, 2004); *Pettus v. McCoy et al.*, 9:04-CV-471 (TJM/GHL) (N.D.N.Y.); *Pettus v. Brown*, 9:04-CV-450 (DNH/GJD) (N.D.N.Y.); *Pettus v. Richards et al.*, 9:04-CV-260 (NAM/GHL) (N.D.N.Y.); *Pettus v. Geaver et al.*, 9:04-CV-228 (LEK/DRH) (N.D.N.Y.); *Pettus v. Parris,* No. 03-CV-4725 (RJD), slip op. at 2 (E.D.N.Y. Oct. 22, 2003); *Pettus v. Clarke*, No. 03-CV-2554 (RJD), slip op. at 4 (E.D.N.Y. Aug. 14, 2003).

[2] Local Rule 7.1(3) states that "[t]he non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."  N.D.N.Y.L.R. 7.1(3).  Plaintiff's Statement of Material Facts fails to comport with Local Rule 7.1(3) as it does not mirror Defendants' Statement of Material Facts nor does Plaintiff number any of his paragraphs.  See Dkt. No. 96, Pl.'s 7.1 Statement.  Nevertheless, this Court will utilize Plaintiff's Complaint with Exhibits, Defendants' Statement of Material Facts and any relevant Exhibits, as well as any relevant Exhibits submitted with Plaintiff's Response to adduce the facts of this case.

Facility to the Cayuga Correctional Facility ("Cayuga") at that time.³ *Id.* at ¶ 4, Exs. 15, AHR entry, dated Oct. 30, 2003, & 16, AHR entry, dated Nov. 6, 2003.

On October 30, 2003, noting that Plaintiff was in transit to Cayuga, Plaintiff's medical records indicate complaints of dizziness, ringing in his ear for some time, and that he felt his condition was worsening and he was losing his balance. *Id.*, Ex. 15, AHR entry, dated Oct. 30, 2003. Plaintiff saw the medical staff at Cayuga on November 4, 2003, and complained about his dizziness, ringing in his ears, and he informed the staff that he was supposed to have had an MRI while at Rikers. Dkt. No. 96, Pl.'s Resp., Ex. 37, AHR entry, dated Nov. 4, 2003. On November 6, 2003, Plaintiff again told the medical staff about his ailments and the MRI he did not receive while also apprising them of his back pain that began after he had fallen while housed at the Ulster Correctional Facility. Pl.'s Resp., Exs. 37, AHR entry, dated Nov. 6, 2003, & 77, Grievance, dated Nov. 17, 2003. On November 10, 2003, Plaintiff complained of dizziness and sought a lower bunk. Compl., Ex. 17, AHR entry, dated Nov. 10, 2003. The medical staff also noted Plaintiff was to see the doctor on November 14, 2003. *Id.* That same day, on November 10, 2003, Health Services requested that Plaintiff be moved to a lower bunk because of his medical condition. Pl.'s Resp., Ex. 40, Request for a Lower Bunk.

On November 14, 2003, Plaintiff was seen by Dr. Bartleson and complained of dizziness. Compl., Exs. 17, AHR entry, dated Nov. 14, 2003, 24, Superintendent's Review, dated Dec. 23, 2003, & 25, Central Office Review Committee ("CORC") Review, dated Jan. 28, 2004. After examining Plaintiff on that date, Dr. Bartleson provided Plaintiff with a bottom bunk permit and

---

³ The exact date of Plaintiff's transfer was not provided to this Court but from the medical records attached to Plaintiff's Complaint, the Court discerns that it was either at the very end of October 2003 or the beginning of November 2003.

recommended Plaintiff receive an MRI.  *Id.*, Exs. 17, AHR entry, dated Nov. 14, 2003, & 25, CORC Review, dated Jan. 28, 2004.  Plaintiff then saw the medical staff on November 20, 2003, again complaining of dizziness.  *Id.*, Ex. 18, AHR entry, dated Nov. 20, 2003.  At that time, the staff noted Plaintiff already had a prescription for his ailments.  *Id.*  On November 25, 2003, Plaintiff again made the same complaints to the medical staff and this time Plaintiff was prescribed medication.  *Id.*, Ex. 18, AHR entry, dated Nov. 25, 2003.  Plaintiff was also seen by medical staff on November 26 and December 9, 2003, for complaints of Vertigo and Plaintiff received medications on both occasions.  *Id.*, Ex. 19, AHR entries, dated Nov. 26, 2003, & Dec. 9, 2003.[4]

Then on December 30, 2003, the request submitted by Dr. Bartleson for an MRI for Plaintiff was denied by the Central Office.  *Id.* at ¶ 12, Exs. 20, AHR entry, dated Dec. 30, 2003, & 25, CORC Review, dated Jan. 28, 2004.  Nevertheless, on December 31, 2003, a request was made by Dr. Bartleson for Plaintiff to receive an otolaryngology consultation.[5]  Pl.'s Resp., Ex. 29, Request for Consultation, dated Dec. 31, 2003.  Plaintiff was next seen by medical staff on January 7 and 8, 2004, whereby Plaintiff stated he was dizzy and asked for a refill on his medication, which Plaintiff received from the pharmacy.  Compl., Ex. 23, AHR entries, dated Jan. 7, 2004, & Jan. 8, 2004.[6]

On February 18, 2004, Plaintiff was scheduled for an outside medical trip to see an ENT specialist.  Dkt. No. 91, Defs.' 7.1 Statement at ¶ 8; Compl. at ¶¶ 14 & 15.  Since Plaintiff was

---

[4] Some time in November, a request was made for Plaintiff to see an ENT specialist and on November 25, 2003, a request was made for Plaintiff to receive an MRI, however, the contents of both requests are unclear as the photocopy submitted to the Court is very light and cannot be discerned.  Compl., Exs. 21 & 22.

[5] The appointment for the otolaryngology consultation was scheduled for April 6, 2004, and occurred on that date, but by that time Plaintiff was transferred, it would seem, to the Southport Correctional Facility.  Dkt. No. 96, Pl.'s Resp., Ex. 29, Request for Consultation, dated Dec. 31, 2003.

[6] No medical records were provided for the time period between January 8, 2004, the date of the last known visit, to February 18, 2004, the date of the incident in question.

housed in the Special Housing Unit ("SHU"), in accordance with Department of Correctional Services ("DOCS") policy, Plaintiff had to submit to a strip frisk before attending his medical trip. Defs.' 7.1 Statement at ¶ 8; Pl.'s 7.1 Statement at (unnumbered) ¶ 4. Correction Officers Kelsey and Mayer and Sergeant Appleby escorted Plaintiff to the frisk area. Defs.' 7.1 Statement at ¶¶ 7-9; Compl. at ¶ 16. While Plaintiff was being escorted and during the frisk, Plaintiff kept asking for his medical records and questioning the procedures regarding the strip frisk. Defs.' 7.1 Statement at ¶ 7; Pl.'s 7.1 Statement at (unnumbered) ¶¶ 1 & 4. Defendant Kelsey, who conducted the strip frisk, was unable to complete the procedure as Plaintiff was not fully cooperative. Defs.' 7.1 Statement at ¶ 7. Defendant Kelsey attempted to give Plaintiff instructions regarding the frisk but was forced to give Plaintiff direct orders to "quiet down and comply with strip frisk procedures." *Id.* However, because Plaintiff was refusing direct orders, Defendant Appleby telephoned Cayuga's medical unit to verify if it was "urgent or essential" for Plaintiff to have his outside medical trip on that particular day. *Id.* at ¶ 8; Pl.'s 7.1 Statement at (unnumbered) ¶ 5. Defendant Appleby spoke to Valerie McCarty, a clerk in the medical unit, who in turn spoke to her supervisor, Nurse Administrator DelFavero, and was told that it was not essential for Plaintiff to attend the appointment that day and that it could be rescheduled. Defs.' 7.1 Statement at ¶ 8; Dkt. No. 96, Pl.'s Resp., Exs. 125, Inmate Grievance Investigation, dated Feb. 23, 2004, & 126, Delfavero Mem., dated Feb. 23, 2004.

As a result of this incident, Plaintiff was issued a misbehavior report charging Plaintiff with violating Rules 106.10, refusing a direct order, 115.10, refusing a search or frisk, 107.10, interference with employee, and 104.13, creating a disturbance. Defs.' 7.1 Statement at ¶ 11; Pl.'s 7.1 Statement at (unnumbered) ¶ 6; Dkt. No. 91, Benny Appleby Aff., Ex. A, Misbehavior Report, dated Feb. 18, 2004. A Tier III Hearing was held in regards to the misbehavior report and Plaintiff

was found guilty of all four charges. Defs.' 7.1 Statement at ¶ 11; *see* Pl.'s Resp., Hr'g Tr.

On February 20, 2004, Plaintiff filed a grievance complaining of his cancelled medical trip. Pl.'s Resp., Exs. 119 & 123, Grievance, dated Feb. 20, 2004. The Inmate Grievance Resolution Committee ("IGRC") conducted an investigation relying on memoranda submitted by DelFavero, Appleby, Kelsey, Mayer, and another sergeant who had interviewed Plaintiff. *Id.*, Exs. 126-130. The IGRC granted Plaintiff's first request in that the appointment was rescheduled but denied the second request as they could not reprimand officers. *Id.*, Ex. 124, IGRC Resp., dated Mar. 4, 2004. Plaintiff appealed to the Superintendent who accepted the grievance in part by noting that the appointment Plaintiff missed was rescheduled. *Id.*, Ex. 118, Superintendent's Review, dated Mar. 12, 2004. However, the Superintendent found Plaintiff's allegations that his medical needs were neglected to be without merit and that Plaintiff's accounting of the events on February 18, 2004, were not supported by the record. *Id.* Plaintiff then appealed to the CORC which upheld the Superintendent's determinations and noted that Plaintiff was scheduled for an otolaryngology appointment and that Plaintiff had been transferred from the facility. *Id.*, Ex. 117, CORC Review, dated Apr. 7, 2004.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this

point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

### B. Eighth Amendment Claim

Plaintiff alleges Defendants were deliberately indifferent to his medical needs when his medical trip was cancelled and his request for an MRI was denied. Compl. at ¶ CLAIM I.[7]

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance*, 143 F.3d at 702 & *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). The subjective element "entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin*, 99 F.3d at 553 (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)).

---

[7] It should be noted that in Plaintiff's Response to the Motion approximately 420 pages of medical records and other documents were submitted. *See* Dkt. No. 96, Pl.'s Resp. However, the majority of the medical records and other documents, not including the deposition transcript, are irrelevant as they are records from the Southport and Elmira Correctional Facilities, where Plaintiff was transferred after the events in this lawsuit. Thus, as those documents do not pertain to the Defendants named in this lawsuit, those extraneous records will be disregarded.

This deliberate indifference must be in regards to the "prisoner's serious illness or injury[.]" *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Additionally, "'[b]ecause society does not expect that prisoners will have unqualified access to health care,' a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care." *Smith*, 316 F.3d at 184 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)) (further citation omitted). Some factors that determine whether a prisoner's medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one").

The prisoner has to show "more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability." *Smith*, 316 F.3d at 184 (internal quotation marks and citation omitted). Prison officials act with deliberate indifference "when [they] 'know[] of and disregard[] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.'" *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. at 837). The Eighth Amendment deals with "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]" *Smith*, 316 F.3d at 186

(citations omitted). Moreover, the "severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Id.* at 187 (citation omitted). A prisoner's disagreement with the form of treatment proscribed by medical personnel will not necessarily implicate the Eighth Amendment. *Ifill v. Goord*, 2004 WL 1663994, at *3 (W.D.N.Y. Apr. 8, 2004) (citation omitted). Furthermore,

> disagreements between a prisoner and prison officials over treatment decisions fall short of cruel and unusual punishment. Thus, disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.

*Id.* (quoting *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001)).

Notably, when a prisoner, in essence, claims medical malpractice,

> a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omission sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Hathaway v. Coughlin*, 99 F.3d at 553 (quoting *Estelle*, 429 U.S. at 106 & n.14).

If the malpractice involved "culpable recklessness, i.e., an act or failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of harm,'" then it may constitute deliberate indifference. *Id.* (quoting *Farmer*, 511 U.S. at 839). Additionally, "[p]rison officials and medical personnel have wide discretion in treating prisoners, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons." *Ifill v. Goord*, 2004 WL 1663994, at *3 (internal quotation marks and citation omitted).

Furthermore, a delay in medical treatment does not necessarily invoke the Eighth

Amendment. The "delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Thomas v. Nassau County Corr. Ctr.*, 288 F. Supp. 2d 333, 339 (E.D.N.Y. 2003) (quoting *Chance,* 143 F.3d at 703). Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is reserved "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition for three days; or delayed major surgery for over two years." *Freeman v. Stack*, 2000 WL 1459782, at *6 (S.D.N.Y. Sept. 29, 2000) (internal quotation marks omitted).

Here, Plaintiff must first make the threshold showing that his medical conditions were in fact serious. Plaintiff alleges his serious medical conditions are that he suffers from Vertigo and Tinnitus. However, Plaintiff has only complained about dizziness and ringing in his ear and has not stated whether there is chronic, acute, or substantial pain involved with either of the conditions. Compl., Exs. 15, AHR entry, dated Oct. 30, 2003, 17, AHR entries, dated Nov. 10, 2003, & Nov. 14, 2003, 18, AHR entries, dated Nov. 20, 2003, & Nov. 25, 2003, 19, AHR entries, dated Nov. 26, 2003, & Dec. 9, 2003, & 23, AHR entries, dated Jan. 7, 2004, & Jan. 8, 2004; Pl.'s Resp., Ex. 37, AHR entries, dated Nov. 4, 2003, & dated Nov. 6, 2003. It is also unclear whether these conditions affect his daily activities. Although he has received some form of treatment for these conditions, Plaintiff has failed to show how these conditions would constitute serious illnesses. *See Davidson v. Scully*, 155 F. Supp.2d 77, 84 (S.D.N.Y. 2001) (holding that tinnitus was not a serious medical condition as the plaintiff's own expert conceded that the plaintiff did not suffer any pain; thus, there was no Eighth Amendment violation).

Nevertheless, even if the conditions were to be considered serious, Plaintiff cannot establish

-11-

that the Defendants acted with deliberate indifference. As for the cancelled trip, Plaintiff was scheduled for an appointment with an ENT specialist. Pl.'s Resp., James Pettus Dep., dated Apr. 12, 2005, at p. 42, lines 2-15. Since Plaintiff was in SHU at the time the trip was to take place, it was Department of Correctional Services ("DOCS") policy that an inmate undergo a strip frisk before going on a trip outside the facility. Appleby Aff. at ¶ 5. However, while the frisk was being administered by Defendant Kelsey, Plaintiff was disruptive and kept asking questions.[8] Pl.'s Resp., Dep. at pp. 45, lines 18-21, 46, lines 8-25, & 47, lines 2-15. Because of Plaintiff's disruptive behavior, Defendant Appleby wanted to cancel the trip. Appleby Aff. at ¶ 7.

Notwithstanding, Defendant Appleby immediately called the medical unit to make sure that the trip could be cancelled and spoke to Valerie McCarty, a clerk in the medical unit, who in turn spoke to her supervisor, Nurse Administrator DelFavero, about the situation. *Id.* DelFavero relayed that it was not essential for Plaintiff to have the appointment on that day and that it could be rescheduled. *Id.*; Pl.'s Resp., Dep. at pp. 49, lines 10-25, & 50, lines 2-23. During this time, Defendant Mayer was only in the room and took no action in the situation. Appleby Aff. at ¶¶ 4-8. Since the medical unit had stated that Plaintiff need not attend the appointment, Plaintiff was returned to his cell. *Id.* at ¶ 8.

Here, Plaintiff cannot show that Defendants Appleby, Kelsey, or Mayer knew of and disregarded an excessive risk to Plaintiff's health or safety. To the contrary, Defendant Appleby did not arbitrarily cancel the trip, but first consulted with the medical unit to make sure the trip was not essential. Furthermore, neither Defendant Kelsey nor Mayer had any part in the decision to cancel the trip. Appleby Aff. at ¶ 7. In fact, Sergeant Appleby states that neither could have intervened to

---

[8] Plaintiff acknowledges that the strip frisk was normal procedure. Pl.'s Resp., Dep. at p. 46, lines 2-4.

prevent the cancellation as he outranks them and was the supervising officer. *Id.* at ¶ 12. In any event, there was no culpable state of mind by any of these three Defendants. Furthermore, Plaintiff admits that he received the outside medical trip and was examined by the ENT specialist approximately one to two months later. Pl.'s Resp., Dep. at pp. 59, lines 21-25, & 60, lines 4-16. This mere delay was not evinced by a conscious disregard of a substantial risk of serious harm to Plaintiff as the appointment was viewed as nonessential. *Thomas v. Nassau County Corr. Ctr.*, 288 F. Supp. 2d at 339; *Freeman v. Stack*, 2000 WL 1459782, at *6. Thus, the claim does not rise to the level of an Eighth Amendment violation.

Plaintiff cannot, as well, establish that Defendant Wright acted with deliberate indifference in denying the MRI requested. Plaintiff concedes that Wright never in fact responded to any letters sent to him about the MRI as they were referred to others. Pl.'s Resp., Dep. at pp. 38, lines 9-25, & 39, lines 2-14. The request was denied by the Central Office. Compl., 25, CORC Review, dated Jan. 28, 2004. Defendant Wright is the Deputy Commissioner and Chief Medical Officer of DOCS, and as such, oversees the entire health care system for approximately 63,000 inmates. Dkt. No. 91, Lester N. Wright, M.D., Decl., dated Nov. 8, 2005, at ¶¶ 1 & 4. Because of his position, complaints regarding medical treatment are routinely distributed to staff in the Central Office for investigations and responses. *Id.* at ¶ 6. Defendant Wright states that the health care practitioners at each facility first attempt to address the problem and if they feel that a specialist is needed, a request is made for a consultation. *Id.* at ¶ 11. The request is then evaluated by review staff and if it meets the nationally accepted criteria, the consultation is scheduled, and if it does not, the request is denied. *Id.* If the primary care provider disagrees with the assessment, it may be appealed to the Regional Medical Director, who may overrule the denial. *Id.* The primary care provider may also further

appeal to the Chief Medical Officer. *Id.* However, no appeal of the denial of the request for an MRI for Plaintiff was made in this case. *Id.* at ¶ 12.

Despite Defendant Wright's lack of involvement, Plaintiff's disagreement over his treatment will not necessarily implicate the Eighth Amendment in a case such as this where there is a disagreement over diagnostic techniques, since disagreements of this sort fall short of cruel and unusual punishment. *Ifill v. Goord*, 2004 WL 1663994, at *3. This type of issue implicates a medical judgment, namely whether the MRI was in fact needed or not. *Id.* At worst, this could be construed as medical malpractice, though that does not seem to be the case here as there was only the denial of an MRI, not other treatment that Plaintiff sought and received. Moreover, medical personnel are afforded wide discretion in treating prisoners and there should not be any interference with ordinary medical practices of state prisons. Defendant Wright and his staff assessed the request for the consultation within their ordinary course of medical practice. Wright Decl. at ¶¶ 8-11. Furthermore, Plaintiff eventually received his MRI while housed at the Elmira Correction Facility on March 23, 2005, and no abnormalities were found in the brain or ears. Wright Decl. at ¶ 17, Ex. C, Consultation Notification, dated Mar. 23, 2005. Thus, Plaintiff has failed to establish deliberate indifference on the part of Defendant Wright or members of his staff.[9]

Therefore, it is recommended that the Motion for Summary Judgment be **granted**.

### C.  Personal Involvement

Plaintiff alleges that Defendant Goord is liable because he is the Commissioner and is responsible for hiring Appleby, Kelsey, and Mayer. Compl. at ¶ CLAIM I. Plaintiff also alleges

---

[9] The lawsuit was only initiated against Defendant Wright and not any members of his staff who may have actually rendered the decision to deny the MRI.

that Defendant Wright is liable because "his office" denied the request for the MRI. *Id.* Defendants Goord and Wright claim they were not personally involved in any wrongdoing. Dkt. No. 91, Defs.' Mem. of Law at pp. 3 & 4.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In the context of supervisory liability, "'[a]bsent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983." *Hernandez v. Keane*, 341 F.3d 137, 144-45 (2d Cir. 2003) (quoting *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987)) (alterations in original). Liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Id.* at 145 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)) (further citations omitted).

Here, in regard to Defendant Goord, Plaintiff has not alleged any personal involvement by Defendant Goord. *See* Compl.; Dkt. No. 96, Pl.'s Mem. of Law. In fact, Plaintiff acknowledged there was no personal involvement and that he would consent to Defendant Goord's termination from this action. Dkt. No. 91, David L. Fruchter Affirm., Ex. A, Pl.'s Dep. at p. 72, lines 4-25. In addition, Plaintiff has made no claim for supervisory liability on the part of Defendant Goord.

As for Defendant Wright, Plaintiff has also failed to allege any personal involvement. *Id.*, Ex. A, Pl.'s Dep. at p. 73, lines 5-25. Instead, Plaintiff claims that he wrote a letter to Wright about

the MRI, Wright referred the letter to someone else, and that other person responded to the letter. *Id.*, Ex. A, Pl.'s Dep. at p. 73, lines 9-15. Thus, Plaintiff essentially claims that Wright is liable in a supervisory capacity. However, Plaintiff has failed to provide any facts or evidence to show that Defendant Wright created a policy or custom that sanctioned conduct amounting to a constitutional violation or allowed such a policy or custom to continue, or that he was in fact grossly negligent in his supervision of subordinates who committed a violation. Plaintiff merely claims that even if there is no direct involvement, Defendant Wright would be liable for those reasons. *Id.*, Ex. A, Pl.'s Dep. at p. 73, lines 9-25. The policies outlined by Defendant Wright as to how the recommendation for a consultation is approved or denied do not amount to a constitutional violation as there is an investigation into the need for the specialist and it is done on the case by case basis. Wright Decl. at ¶¶ 8-11. Furthermore, there is no evidence presented that would show grossly negligent supervision of the person who actually made the decision to deny the MRI and as stated above, the denial does not amount to a violation of the Eighth Amendment.

Therefore, it is recommended that the Motion for Summary Judgement be **granted** as to Defendant Goord for lack of personal involvement and Defendant Wright for lack of personal involvement and failure to establish supervisory liability.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Motion for Summary Judgment (Dkt. No. 91) be **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date:   August 9, 2006
        Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge